OPINION
Plaintiff, Clyde E. Price, appeals from a judgment of the Franklin County Municipal Court, Environmental Division, awarding him nominal damages of one dollar on his nuisance claim. Plaintiff sets forth the following five assignments of error:
 [1.] The trial court erred at page 121 of the record when it failed to award appellant damages beyond the $1.00 that was awarded since it had earlier found in favor of appellant as to the issue of liability and the trial was a damages-only hearing.
 [2.] The trial court erred at page 121 of the record when it failed to make a specific finding as to the amount of appellant's damages beyond the $1.00 that was found and awarded since it had earlier found in favor of appellant as to the issue of liability and the trial was on damages.
 [3.] The trial court erred at page 121 of the record when it failed to grant appellant's motion to substitute the Administrator of the Estate of Robert E. Parker for Robert E. Parker who died before trial and while the case was pending.
 [4.] The trial court erred at page 121 of the record when it failed to award appellant exemplary damages due to the trespass by appellees which was the running of raw sewage from beneath appellees' land to the subsurface of the land of appellant AND appellees' absolute conscious disregard for appellant's rights in his real estate, and the trial court's earlier order enjoining appellees from the same, which had a great probability of causing and did cause substantial harm to appellant.
 [5.] The trial court erred at page 121 of the record with an award of $1.00 which is against the manifest weight of the evidence.
Defendant Robert E. Parker is the titled owner of a parcel of real estate located on East Dublin-Granville Road in Columbus, Ohio ("the Parker property"). Defendant Gary Parker, the son of Robert E. Parker, is the land contractor purchaser of the property. In 1994, plaintiff purchased an adjoining parcel of real estate located on Sinclair Road ("the Price property"). A portion of the west property line of the Parker property is contiguous to the entire seventy-five foot east property line of the Price property. At the time plaintiff purchased the Price property, sewage treatment for two buildings located on the Parker property was provided by an on-site septic system.
By letters dated October 28, 1994, January 10, 1995, and February 3, 1995, the City of Columbus Health Department notified defendants that a chemical dye test conducted by the city revealed that the septic system on the Parker property was functioning improperly. The city ordered that the condition be corrected because the system was allowing wastewater to accumulate and leach into surrounding soil and water sources.
On June 22, 1995, plaintiff filed a complaint alleging that the failure of the on-site septic system on the Parker property caused liquid and solid sewage refuse to flow onto the rear of the Price property, thereby creating a public nuisance; that despite orders by the city to correct the improperly functioning sewage system, defendants failed to cure the problem; that plaintiff could not construct a planned commercial building on his property until the waste was removed; and that defendants' failure to abate the nuisance constituted a willful, wanton and malicious violation of the law and plaintiff's property rights. Plaintiff's complaint demanded that the nuisance condition be abated and that compensatory and punitive damages be awarded.
Concurrent with the filing of the complaint, plaintiff filed a motion for a temporary restraining order and preliminary injunction, requesting that defendants be restrained from utilizing their on-site sewage disposal system. Pursuant to a hearing held on July 7, 1995, the trial court found that defendants' operation of the failed on-site sewage disposal system created a nuisance which posed an immediate risk to the public health and safety; accordingly, the court issued a temporary restraining order prohibiting defendants from discharging sewage onto the Price property. Defendants were granted permission to enter the Price property in order to remove the liquid and solid sewage refuse that had been deposited thereon. Pursuant to an agreed entry filed July 25, 1995, the temporary restraining order was extended through August 29, 1995. Defendants subsequently arranged for the surface nuisance to be abated.
On July 29, 1995, plaintiff began excavation work on his property as the first step in the construction of the commercial building. On August 7, 1995, plaintiff filed a motion requesting that defendants show cause why they should not be found in contempt for violating the temporary restraining order, based upon plaintiff's discovery of subsurface water contamination. At an August 14, 1995 hearing, the trial court found that the water contamination was proof that the nuisance required to be abated by the temporary restraining order had not been completely abated. Accordingly, defendants were found in contempt. The temporary restraining order expired on its own terms on August 29, 1995, and was not extended by agreement or entry. Construction of the commercial building on the Price property was completed sometime in 1996.
Over the next two years, the parties engaged in settlement negotiations with regard to plaintiff's claim for damages. No settlement could be reached, however, and on December 10 and 11, 1998, a hearing was held to determine whether plaintiff was entitled to damages resulting from the nuisance created by defendants' operation of the failed on-site septic system. At that hearing, Eric Wooley testified that in July 1995, he was hired by plaintiff to excavate the Price property in preparation for the construction of the new facility. When Wooley began digging the footers for the facility, he encountered an extensive field drainage system running underneath the surface of both the Price and Parker properties. When he inadvertently broke one of the drainage tiles during excavation, he discovered green-colored water (from the chemical dye test conducted by the city) which smelled septic. The water was pumped into a public storm sewer and into an open ditch on the west side of the Price property. Wooley described the soil conditions on the Price property as "wet," "mushy," "saturated," and "mucky." Wooley testified that over a five-day period, his company excavated approximately 3,200 cubic tons of this "mushy" soil from the Price property. According to Wooley, he deposited approximately twenty loads of the soil onto adjoining properties; the rest was loaded into trucks, which were then unloaded at a landfill. The landfill did not charge to accept the "mushy" soil because it was considered clean fill and was used to cover disposed construction debris. Much of the "mushy" soil excavated from the Price property was replaced with gravel.
Plaintiff testified that prior to purchasing the property at issue, he spent two years looking for a suitable site on which to build his commercial warehouse/office facility. He further testified that he examined the property for approximately twenty minutes prior to making his decision to purchase it. During this inspection, he observed standing water and discoloration of the grass in the rear corner of the property. Plaintiff admitted that despite this observation, he conducted no studies as to the suitability of the soil for construction of a building, nor did he discuss the soil conditions or drainage system with adjoining landowners.
Plaintiff testified that he incurred substantial costs in restoring the property to its natural (pre-contamination) condition, including excavation costs of $3,623.75; trucking costs of $10,677.28; equipment rental costs of $10,038.20; gravel (to replace "bad" soil) costs of $17,757.63; and loss-of-use costs of $10,500 (due to the three-month delay in construction).
Charles R. Porter, Jr., owner of The Charles R. Porter Company, and one of his staff appraisers, Christopher D. Placke, testified as expert real estate appraisers on behalf of plaintiff. Placke testified that he performed an appraisal of the Price property on June 6, 1995, on behalf of a potential lender for plaintiff's proposed commercial warehouse/office facility. Placke appraised the property without improvement at $100,000.
Both Porter and Placke testified that they could not render an opinion regarding the diminution in property value artributable to any nuisance or contaminated condition on the Price property, or give an opinion regarding the value of the site before any nuisance or contamination was present. However, both Placke and Porter stated that the methodology to be followed in calculating the value of a contaminated site would be to value the property as if uncontaminated, subtract from that value the cost to cure the contamination, and further subtract an additional factor of "entrepreneurial reward." "Entrepreneurial reward" was explained as an amount a potential buyer would be entitled to receive for purchasing a damaged site (usually ten to fifteen percent of the uncontaminated value).
The appraisal report prepared by Placke and Porter states on page 14 under "Site Analysis" ("Topography and Drainage") that the site's topography would be level after completion of the proposed site development/improvement and construction. The report also noted that according to plaintiff, part of the site preparation/improvement of the proposed project included filling the rear of the lot and necessary storm sewer work to provide the site with adequate drainage.
Forest Smith, a self-employed excavator, testified on behalf of defendants. Smith testified that in March 1995, Robert Parker hired him to remove the contaminated material from the Price property in compliance with the temporary restraining order. In so doing, he observed cattails and swamp grass growing in the area. In August 1995, he sealed the discharge outlet to the septic tank. Regular pumping of the contents of the tank began and continued through the early months of 1998, when Smith completed the excavation and installation of a sewer line on the Parker property that connected the buildings to the city's sewage system.
Smith further testified that during the installation of the sewer line in 1998, he found "wet ground water in the soil all the time, the full length" (Tr. 417) of the excavation from the two buildings to the sanitary sewer line. He further testified that "the soil was moist enough that water seeped into the ditch the full length of the ditch, and sometimes we had problems with the side walls of the excavation wanting to fall in." (Tr. 417.)
Gary Parker testified that from 1981 through 1988, the Price property was frequently marshy and wet, with freestanding water, ponding conditions and vegetation, such as cattails and tall grasses. He further testified that he did not think there was a problem with the septic system, but complied with the city's orders in order to be cooperative. In that regard, he voluntarily caused the tank to be sealed in August 1995 and regularly pumped the tank until connection to the city's sewer line was completed.
On December 16, 1998, plaintiff filed a post-trial Civ.R. 25(A) motion seeking to substitute the administrator of the estate of Robert E. Parker as a defendant for Robert Parker, who died during the pendency of the proceedings. Defendant Gary Parker filed a memorandum in opposition to plaintiff's motion.
In a decision and judgment entry filed February 11, 1999, the trial court denied as untimely plaintiff's Civ.R. 25(A) motion for substitution. The trial court awarded plaintiff one dollar in nominal damages. Plaintiff has timely appealed the trial court's decision.[1]
By the first, second, and fifth assignments of error, plaintiff argues that the trial court's award of one dollar in nominal damages was against the manifest weight of the evidence. Plaintiff also contends that the trial court failed to make findings of fact and conclusions of law in compliance with Civ.R. 52.
When reviewing a trial court's decision on a manifest weight of the evidence basis, we are guided by the presumption that the findings of the trier of fact were correct. Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures. Id. Thus, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, syllabus.
Generally, when reparable damage occurs as a result of a nuisance condition, a property owner may recover "restoration damages," representing the cost of restoring the property to its condition before the nuisance. "* * * If restoration can be made, the measure of damages is the reasonable cost of restoration, plus the reasonable value of the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property as a whole before and after the injury, in which case the difference in the market value before and after the injury becomes the measure." Ohio Collieries Co. v. Cocke (1923),107 Ohio St. 238, paragraph five of the syllabus. In other words, under the general rule, recoverable restoration costs are limited to the difference between the pre-injury and post-injury fair market value of the real property. Id.; Reeser v. Weaver Bros.,Inc. (1992), 78 Ohio App.3d 681, 692. Therefore, if restoration costs exceed the diminution in fair market value, the diminution in value becomes the measure of damages. Furthermore, recovery under this rule necessarily places the burden of establishing the diminution in market value on the complaining party. Id.
Plaintiff argues that he submitted uncontroverted evidence of both types of damages?the diminution in fair market value due to the nuisance condition ($57,086.86) and the cost to restore the property to its natural condition, including the reasonable value of the loss of use of the property between the time of injury and restoration ($52,586.86) and is thus entitled, pursuant to OhioCollieries and Reeser, supra, to compensatory damages of $52,586.86, which is the lesser of the two damage calculations. We disagree.
The trial court found that although the evidence established that the failure of defendants' septic system caused a measure of contamination of the ground water on the Price property, the evidence submitted by plaintiff was insufficient to establish that the costs he incurred in excavating the wet soil, transporting the excavated soil to the landfill, and for gravel to support the new building foundation were attributable to the failed septic system, rather than to the naturally wet condition of the subsoil that existed prior to the failure of the septic system. Accordingly, the trial court awarded plaintiff nominal damages of one dollar. The award of money damages based upon a finding of nuisance is discretionary with the trier of fact.Blevins v. Sorrell (1990), 68 Ohio App.3d 665, 669. Further, nominal damages are recoverable "where a legal right is to be vindicated against an invasion thereof which has produced no actual loss of any kind, or where, from the nature of the case, some injury has been done, the extent of which the evidence fails to show. * * *" Lacey v. Laird (1956), 166 Ohio St. 12, paragraph two of the syllabus. Upon review of the record, we find competent, credible evidence to support the trial court's decision.
The portion of the Price property that abuts the Parker property is approximately one foot lower than the Parker property. Gary Parker testified that from 1981 through 1988, the rear of the Price property was frequently marshy and wet, with freestanding water, ponding conditions and vegetation, such as cattails and tall grasses, and, following heavy rains, became extensively flooded. Plaintiff testified that prior to purchasing the property in 1994, he observed standing water and discoloration of the grass in the rear corner of the property. Smith testified that he observed cattails and swamp grass growing on the Price property in March 1995 when he removed the surface contamination. As the trial court noted, this evidence suggests that the ground water beneath the rear portion of the Price property accumulates there from the surface, which is burdened because it is lower than the Parker property.
Further, both the Parker and Price properties have a long history of bearing ground water. The extensive drainage system underneath both properties demonstrates that previous property owners recognized that the saturated conditions of the soil required frequent drainage. Even after the septic system on the Parker property had been sealed and pumped from August 1995 through the early months of 1998, the soil at the rear of the Parker property continued to be saturated by ground water.
Despite plaintiff's awareness of the persistently wet soil conditions and inadequate drainage system, he did not question adjoining landowners regarding the soil conditions or drainage system, and did not conduct studies as to the suitability of the soil for construction of a building prior to purchasing the property and commencing construction. Further, plaintiff's contention that all of the ground water and soil removed in July 1995 was "contaminated" by defendants' failed septic system is belied by evidence that he pumped the water into a public storm sewer and an open ditch along the side of the property and unloaded some of that soil onto an adjoining property.
In short, we agree with the trial court's conclusion that the evidence offered at the damages hearing, while sufficient to establish that defendants' failed septic system caused a nuisance condition on plaintiff's property, was insufficient to establish plaintiff's claim for recovery of costs incurred in removing the wet soil and preparing the site for construction. The evidence established that plaintiff would have encountered wet soil conditions and incurred substantial costs in removing the wet soil and preparing the site for construction of the new facility even if defendants' septic system had not failed.
We further find no merit to plaintiff's assertion that the trial court failed to make findings of fact and conclusions of law in compliance with Civ.R. 52. The purpose behind separately stated findings of fact and conclusions of law is to aid the appellate court in reviewing the trial court's decision. Orlow v.Vilas (1971), 28 Ohio App.2d 57, 59. A trial court decision which recites various facts and a legal conclusion satisfies the requirements of Civ.R. 52 where, when considered in conjunction with other parts of the trial record, an adequate basis exists upon which the appellate court may conduct its review. Stone v.Davis (1981), 66 Ohio St.2d 74, 85.
In the instant case, the trial court wrote a sixteen-page opinion in which it addressed each of the issues raised by plaintiff at the damages hearing and made various factual findings. The court also made various conclusions of law, namely, that although defendants' failed septic system caused a measure of contamination of the ground water on the Price property, plaintiff did not present sufficient evidence to establish that the costs he sought to recover were the result of the nuisance created by defendants, rather than the pre-existing wet soil conditions. We believe the decision of the trial court more than adequately explained its reasoning and the basis therefor. For the foregoing reasons, plaintiff's first, second and fifth assignments of error are overruled. By the third assignment of error, plaintiff asserts that the trial court erred in denying his motion to substitute the administrator of the estate of Robert Parker for Robert Parker as a defendant.
The record in the instant case indicates that original counsel for defendants Gary Parker and Robert Parker was granted leave to withdraw on December 10, 1996. On April 4, 1997, new counsel entered an appearance for defendant Gary Parker only. Robert Parker, however, remained unrepresented by counsel. A scheduling entry dated October 24, 1997, noted the following: "Defendant Robert Parker, now deceased, is not represented, nor is his estate a party at this time. It appears that plaintiff will proceed to join the estate of Robert Parker as a party to this action." A review of the record reveals, however, that plaintiff did not file either a suggestion of death or a motion for substitution after the October 24, 1997 scheduling entry.
On December 16, 1998, five days after the conclusion of the damages hearing, plaintiff filed a motion for substitution, arguing that since no formal suggestion of death had yet been filed as required by Civ.R. 25(A), the ninety-day time limit for filing a motion for substitution had not yet begun to run. Plaintiff suggested in his motion that he had, immediately prior to the filing of the motion for substitution, filed a suggestion of death. A review of the record reveals, however, that no suggestion of death was filed by plaintiff.
The court found that the October 24, 1997 scheduling entry, which noted the death of Robert Parker, provided the parties ample time to move for substitution prior to the December 1998 trial. The court further reasoned that granting the motion would require re-opening the trial so that Robert Parker's estate would have an opportunity to defend.
The procedure by which a decedent's personal representative is made a party to a pending action is set forth in Civ.R. 25, which states in pertinent part:
(A) Death
 (1) If a party dies and the claim is not thereby extinguished, the court shall, upon motion, order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 through Rule 4.6 for the service of summons. Unless the motion for substitution is made not later than ninety days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.
* * *
 (E) Suggestion of death or incompetency Upon the death or incompetency of a party it shall be the duty of the attorney of record for that party to suggest such fact upon the record within fourteen days after he acquires actual knowledge of the death or incompetency of that party. The suggestion of death or incompetency shall be served on all other parties as provided in Rule 5.
Because Robert Parker was unrepresented by counsel at the time of his death, there was no attorney to follow the procedures set forth in Civ.R. 25(A) and (E). Notice of Robert Parker's death, however, appeared in the trial court's October 24, 1997 scheduling entry. As did the trial court, we choose to consider the scheduling entry of October 24, 1997 as a suggestion of the fact of Robert Parker's death. Despite plaintiff's admission that Robert Parker's death was known by the parties and the court, plaintiff did not file his motion for substitution until December 16, 1998, over fifteen months after the notification of Robert Parker's death. Plaintiff does not suggest that he was prevented in any way from moving for substitution at an earlier time. The ultimate burden of complying with Civ.R. 25(A) rests with the party bringing the action. Barrett v.Franklin (1986), 32 Ohio App.3d 51. Because plaintiff's motion for substitution was made well over ninety days after the October 24, 1997 entry was filed, the trial court did not err in denying the motion as untimely. Accordingly, the third assignment of error is overruled.
By the fourth assignment of error, plaintiff contends that the trial court erred in failing to award him punitive damages. Punitive damages are awarded to punish the guilty party and deter tortious conduct. Wightman v. Consolidation Rail Corp.
(1999), 86 Ohio St.3d 431. An award of punitive damages is available upon a finding of actual malice. Sutherland v.Nationwide Gen. Ins. Co. (1994), 96 Ohio App.3d 793, 810, citingCalmes v. Goodyear Tire Rubber Co. (1991), 61 Ohio St.3d 470,473. In Preston v. Murty (1987), 32 Ohio St.3d 334, the Supreme Court of Ohio defined "actual malice" necessary for an award of punitive damages, as: "* * * (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis sic.) Id. at syllabus. "Actual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross."Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 37.
Plaintiff argues that defendants' failure to notify adjoining property owners of the problem with the septic system and failure to immediately obey the trial court's order to abate the nuisance constituted "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." We note that the trial court did not specifically address the issue of punitive damages; however, from our review of the record, we cannot agree that defendants acted with malice toward plaintiff. We do not believe that defendants exhibited such a conscious disregard for the rights and safety of others to constitute malice as a matter of law. The evidence presented to the trial court established that defendants arranged for the surface nuisance to be abated within a reasonable time and voluntarily sealed their septic tank and regularly pumped the tank until connection to the city's sewer line was completed. Thus, an award of punitive damages for plaintiff would be improper in this case. Accordingly, the fourth assignment of error is overruled.
For the foregoing reasons, all five of plaintiff's assignments of error are overruled, and the judgment of the Franklin County Municipal Court, Environmental Division, is hereby affirmed.
Judgment affirmed.
BRYANT, J., and BOWMAN, P.J., concur.
[1] Although defendant Gary Parker filed a notice of cross-appeal on March 23, 1999, he advances no cross-assignments of error.